## Herron v. Universal Auto Loan Company

*Croskey & Edwards*, for plaintiff.

*William Ginsburg* and *J. Webster Jones*, for defendant.

BOK, P. J., May 15, 1944.—This is an action for malicious prosecution brought by a former employe of defendant who had been arrested for embezzlement and fraudulent conversion by his employer and later cleared. The jury found a verdict in his favor for $7,340 and defendant asks for judgment n. o. v. or a new trial.

Plaintiff, an experienced automobile finance man, was employed by defendant loan company on September 23, 1940, to take charge of its branch office in Germantown. When someone applied for a loan on his car, plaintiff made out various papers, among them a settlement sheet showing the amount of the loan, the amount deducted to pay charges to other companies, if any, or expenses such as insurance and title fees, and the balance to be given the borrower. Plaintiff then drew a check but did not sign it—having no au-

thority to do so—had the borrower endorse it, and gave him in cash the amount of the loan minus charges. Plaintiff then sent the check to the central office, where it was signed and returned to plaintiff, who either deposited it or, if he needed ready money for making other loans, cashed it.

It was plaintiff's duty to record his transactions by making out and signing a daily cash disbursement sheet, showing money paid out, and a daily cash receipt sheet, showing money received from borrowers by way of principal, interest, insurance, title fees, etc. Attached to the latter sheets were duplicate deposit slips from the bank. In both sets of sheets each page bore a number of its own, an account number, a daily and accumulated money total, and was signed by plaintiff. These records, plus the bank statements, gave a full account of everything done by plaintiff at the branch office.

In July 1941 discrepancies were noticed in plaintiff's accounts. A preliminary audit was made on July 23rd and a shortage of $1,316.42 was found. On July 25th defendant's president, Wolgin, reported an apparent shortage of $1,100 to its bonding company, and plaintiff was present when this was done. Defendant's accountants, Fernald & Co., reported the $1,316.42 shortage to the bonding company on July 30, 1941, and Charles H. Steel & Co., who made another audit two years later, reported that the shortage was $1,344.02, an additional $27.60 in unreported collections having been discovered meanwhile.

On July 28th plaintiff, at Wolgin's request, wrote out the following statement and signed it:

"7/28/41

Universal Auto Loan Co.
2411 N. Broad St.
Phila.

Gentlemen:

This is to notify you that I am fully responsible for all monies received by me and not entered upon Daily

Cash receipt report for deposit, upon all accounts upon the books to and including July 22/1941 that may be found as having been paid upon more detailed check up and investigation by competent authorities, and the same will be paid by me upon proper proof of same.

Also that I am fully responsible for the amount of shortages as evidence by the cash check as made on July 22/1941 to the amount evidenced therein, unless a future check of same reduces the amount thereof, if so then for the balance still due.

The amount so checked on said date was reported to the Bonding Company on Friday July 25/1941.

Walter S. Herron"

Witness at Phila.
    July 28, 1941
    J. Wolgin

Plaintiff continued in defendant's employ until September 11, 1941, when Wolgin told him the bonding company would not permit him to pay plaintiff's salary any longer. Plaintiff then left his job. He was arrested October 4th. He put up bail and was tried on June 18, 1942. He was freed when the trial judge sustained demurrers to all bills of indictment, and this suit followed.

It requires no citation of authority to show that an action of malicious prosecution is based on three elements, all of which must concur: (1) The criminal prosecution must have ended favorably to the defendant; (2) it must have been actuated by malice; (3) it must have been instituted without probable cause. Plaintiff has the burden of proving all three.

Defendant now raises three points, which we shall consider seriatim.

1. It offers the suggestion that the sustaining of a demurrer under the Act of June 5, 1937, P. L. 1703, 19 PS §481, is not such a favorable termination of a

criminal case as will support a consequent action of malicious prosecution.

We see no merit in this suggestion, for in our opinion a successful demurrer is clearly an end of the case, especially where the Commonwealth fails to appeal; here the time for appeal had passed before this suit was begun. The Superior Court's opinion in Commonwealth v. Heller et al., 147 Pa. Superior Ct. 68 (1942), clearly infers a final termination when it speaks of the defendant being "discharged" after his demurrer has been sustained. And in Gow v. Adams Express Co., 61 Pa. Superior Ct. 115 (1915), the criminal prosecution was ended by a nol. pros. and the malicious prosecution suit was begun well within the statute of limitations. Hence, even though Gow could have been rearrested after the nol. pros., no one raised the point, and while judgment was entered for the defendant n. o. v. it was because probable cause was held to exist and not because the criminal case had not been shown to have ended favorably to the civil plaintiff. In McClafferty v. Philp, 151 Pa. 86 (1892), the criminal prosecution also ended in a nol. pros. The finality of a successful demurrer is greater than a nol. pros., for it bars a second prosecution for the same offense: Commonwealth v. Marino et al., 142 Pa. Superior Ct. 327 (1940).

2. Defendant contends that the inference of malice has been conclusively rebutted because it consulted counsel before instituting the criminal action.

This is undoubtedly the law. The pertinent cases are cited in Stritmatter v. Nese et al., 347 Pa. 9 (1943), which also quotes the Restatement of Torts, vol. 3, sec. 666, p. 416, as follows:

"The advice of an attorney at law admitted to practice and practicing in the state in which the proceedings are brought, whom the client has no reason to believe to be interested, is *conclusive* of the existence of probable cause for initiating criminal proceedings in

reliance upon the advice if it is (a) sought in good faith, and (b) given after a full disclosure of the facts within the accuser's knowledge and information." (Italics supplied.)

This case states flatly that malice was rebutted by seeking counsel and makes an observation which applies equally to the instant case—that there was no evidence tending to show that the attorney's advice was not sought and acted on in good faith.

The evidence is uncontradicted and was twice repeated that Israel Wolgin, defendant's president, went to his attorney, Daniel Marcu, Esq., a reputable member of the bar, and told him "exactly" what happened. The attorney then made out the affidavit to hold to bail and Wolgin took it to a notary and then to the magistrate. While the attorney did not testify and while Wolgin did not repeat on the stand what he had told the attorney, his statement was not contradicted and he was not cross-examined on the question of full disclosure to the attorney or of the attorney's disinterest. Wolgin did not cause the warrant to issue until after he had reported the loss to the bonding company and had in his possession the plaintiff's written statement and the report of his auditor. Furthermore, he testified, "after the conversation with him [Herron] he admitted to me that he had the money".

We are of opinion that such evidence rebuts the element of malice and bears also on the question of probable cause.

3. Defendant contends that the existence of probable cause is a question of law for the court.

This is also undoubtedly the law, provided (a) the plaintiff's own evidence shows the existence of probable cause (Taubman v. Schulte, Inc., 302 Pa. 170 (1931), Scott v. Dewey, 23 Pa. Superior Ct. 396 (1903)); or (b) the admitted facts and the reasonable inferences from them show the existence of probable

cause (Taylor v. American International Shipbuilding Corp., 275 Pa. 229 (1922)) ; or (c) the facts have been established by uncontradicted evidence (Kuhns v. Ward-Mackey Co., 55 Pa. Superior Ct. 164 (1913)).

It must be remembered that "Probable cause is a reasonable belief in known or reported circumstances, sufficiently inculpatory, and adequate to justify a prudent man in acting as prosecutor of a crime against the accused. It does not depend on guilt, or the actual existence of the reported facts, but is based on an honest and reasonable belief in their existence.

"Representations of others may be sufficient foundation for it, especially if made by those who have had opportunities for knowledge. He who has reasonable ground for belief of guilt stands acquitted of liability, although he subsequently learns his mistake": Taylor v. American International Shipbuilding Corp., supra, p. 231.

Plaintiff's testimony contains sufficient to show probable cause.

He kept the books of the Germantown branch and identified them at the trial. He admitted that he collected $123.48 on April 23, 1941, deposited it on April 30th, but credited it to collections made on April 18th.

He admitted that he received $237.27 from a man named Hill and cleared and returned to Hill his title certificate on March 15th. He did not deposit this collected money, however, until July 24th, one day after defendant made its first audit. He gave the lamest possible excuse for this incident. He said that the bank statement at the end of the month (presumably March) showed no bank shortage: he therefore used the Hill money to make loans without putting them through the books and then determined that the shortage was in the cash drawer. This he blamed on "nightly visitors" who somewhat incontinently left their lipstick, powder and bobby pins behind them. "I am rather glad you

asked about that Mr. Jones", is the way he began his curious explanation of this damning piece of evidence. Instead of reporting either the shortage or the nocturnal visitation he waited until July, then borrowed some money from his wife, sold some property of his own, and replaced the missing funds the day after defendant began to investigate him.

Finally, he wrote out and signed the statement of July 28th, admitting a shortage of $1,100 and saying he was responsible for it. Whether this was a "confession" or a statement of the obvious fact that he was responsible for the branch's finances, it is a clear admission that a shortage existed. His efforts to justify the shortage in dollars and cents failed signally. Giving him credit for all he claimed, namely, $215 for Miss Cohen's salary, $94.60 for petty cash items, $69.60 for employing men to distribute circulars, $25 due him in the adjustment of an account with another company, and $595 for three checks apparently in transit when the shortage was first discovered, the total of these items is $999.20. This is still short of the $1,100 shortage reported initially to the bonding company. If there were still more checks in transit, they may be reflected in the credit of $1,426.60 which was finally given him in arriving at the ultimate shortage of $1,344.02.

In addition to these facts, the complete books from which the accountants made the audit are in evidence and were identified by plaintiff. Two sets of them—the cash receipt and disbursement sheets—are signed by him or by Miss Cohen at his direction. The other papers consist of the bank statements and deposit slips, whose accuracy has not been challenged.

Finally, there is Wolgin's testimony, undenied, that plaintiff admitted that he had the money.

It will be seen from the reports of the auditors, exhibits D7 and D16, that all but one of the undeposited

collections on which the shortage was based were made between July 3 and July 23, 1941. It is not disputed that Miss Zimmerman called plaintiff about this: he had reported cash receipts on his daily sheets but there were no deposit slips to cover them. This was something new, she said. Plaintiff had explained that when he received cash payments from customers he used it again to make loans without first depositing it because he had not been given enough working capital. Nevertheless, looking at the situation from defendant's angle, the sudden prevalence of these undeposited collections, together with the other circumstances in the case, gave defendant ample basis in fact and in appearance to charge Herron with embezzling its funds.

Defendant's point for binding instructions should have been granted, since in our opinion the plaintiff's case and the admitted facts establish the existence of probable cause as a matter of law: Stritmatter v. Nese, supra; Altman v. Standard Refrigerator Co., Inc., 315 Pa. 465 (1934).

The case is almost on all fours with Kuhns v. Ward-Mackey Co., 55 Pa. Superior Ct. 164, and in our opinion is ruled by it. There the employe kept the books, which showed a shortage, and rendered daily reports to his employer. When caught he admitted the shortage and made it up out of his own pocket: later he was caught again, and said he couldn't understand his being short, just as Herron did here. The court said (p. 167):

"Under such a state of facts we are of the opinion a jury should not have been permitted to find a verdict for the plaintiff. If the facts we have stated, no one of which is really in controversy, do not constitute probable cause for beginning a criminal prosecution, it would be difficult to have prosecutions begun at any time except by the public authorities, and thus the interests of the public would suffer. It is true, when the case came on to be tried, the defendant was able to ex-

plain away the appearances of guilt to the satisfaction of the jury, and their verdict of course establishes that he was in fact innocent. But this in no way weakens the force of the circumstances we have referred to as they appeared to the prosecutor and must have appeared to any reasonable man."

Judgment is entered for defendant n. o. v.